# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kareem Alleyne        :
             :
     v.        : No. 1648 C.D. 2016
             : Argued:  October 17, 2017
Police Detective George Pirrone,  :
Police Detective James Pitts, and  :
Lieutenant Philip Riehl,     :
     Appellants   :


BEFORE: HONORABLE P. KEVIN BROBSON, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE DAN PELLEGRINI, Senior Judge


**OPINION BY JUDGE BROBSON**   **FILED:  March 9, 2018**


Detective George Pirrone (Detective Pirrone), Detective James Pitts (Detective Pitts), and Lieutenant Philip Riehl (Lieutenant Riehl) (collectively, Appellants) of the Philadelphia Police Department appeal from an order of the Court of Common Pleas of Philadelphia County (trial court).  Following a trial, a jury found all three defendants liable to Kareem Alleyne (Alleyne) for malicious prosecution and found Detective Pirrone and Lieutenant Riehl liable to Alleyne for false arrest.  Appellants appeal from the trial court's denial of their motion for judgment notwithstanding the jury's verdict.  For the reasons set forth below, we reverse.

## I.  BACKGROUND

### A.  Criminal Prosecution and Initiation of Civil Suit

The arrest that set this civil action in motion followed the death of Officer Marc Brady (Officer Brady).  Officer Brady died from injuries he sustained

on July 15, 2012, as a result of being hit while riding a bicycle by a vehicle driven by Alleyne. Officer Brady and Alleyne had a history of personal conflict. Following the incident, the Philadelphia District Attorney's Office charged Alleyne with Homicide by Vehicle and Involuntary Manslaughter.[1] At a preliminary hearing on October 2, 2012, Alleyne moved the criminal trial court to dismiss both charges for lack of probable cause. Ultimately, the criminal trial court judge denied Alleyne's motion: "The bottom line is, I think at this level I'm going to leave it to the finder-of-fact to decide." (Certified Record (C.R.) No. 27, Ex. E, at 45.) Alleyne's criminal trial began on June 12, 2014, and ended on June 17, 2014, when, following the Commonwealth's presentation of its case, the criminal trial court entered a directed verdict of not guilty on both charges.

On September 15, 2014, three months after the close of the criminal trial, Alleyne filed the subject civil action, alleging false arrest and malicious prosecution against Detective Pirrone and Lieutenant Riehl. (C.R. No. 4.) In

---

[1] Homicide by Vehicle is defined as follows:

> (a) Offense.--Any person who recklessly or with gross negligence causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic except section 3802 (relating to driving under influence of alcohol or controlled substance) is guilty of homicide by vehicle, a felony of the third degree, when the violation is the cause of death.

75 Pa. C.S. § 3732(a).

Involuntary Manslaughter is defined as follows:

> (a) General rule.--A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa. C.S. § 2504(a).

response, Appellants raised the defense of immunity under the Political Subdivision Tort Claims Act (Tort Claims Act), 42 Pa. C.S. §§ 8541-8564, in their answer with new matter. Appellants averred that they were entitled to immunity as officers of a political subdivision.[2]

Alleyne amended his complaint on September 2, 2015, to add Detective Pitts as a defendant. (C.R. No. 16.) The amended complaint re-alleged that Appellants acted "in concert and conspiracy" to deprive Alleyne of his right "to be free from unlawful arrest and malicious prosecution." (*Id.* at ¶ 4.) Specifically, Alleyne averred that Appellants knowingly made the following false statements during the investigation: (1) Detective Pirrone and/or Detective Pitts informed the accident investigator, William Lackman (Officer Lackman), that they suspected the collision was intentional and motivated by a three-year long dispute (*id.* at ¶ 46); (2) Detective Pirrone informed the Medical Examiner's Office that Officer Brady was struck by someone he knew, and that that person had been "lying in wait" to attack Officer Brady (*id.* at ¶¶ 49-52); (3) Detective Pitts informed the Medical Examiner's Office that there were inconsistencies between Alleyne's statements and the physical evidence at the scene, and he faxed Alleyne's statement to the Medical Examiner's Office (*id.* at ¶ 53); and (4) Detective Pirrone and/or Detective Pitts informed the Medical Examiner's Officer that Officer Brady was shot by a person that drove a car similar to Alleyne's (*id.* at ¶¶ 55-57.) Alleyne also alleged that Lieutenant Riehl was vicariously liable for failing and refusing to supervise Detective Pirrone and Detective Pitts and for failing to prevent his false

---

[2] On July 17, 2015, by stipulation between the parties, the trial court dismissed with prejudice the Office of the District Attorney of Philadelphia, Assistant District Attorney Jennifer Selber (individually and in her official capacity), and Assistant District Attorney Mark Levenberg (individually, and in his official capacity) as defendants. (C.R. No. 10.) This is the only evidence in the record before us that those parties were ever named as defendants.

arrest and malicious prosecution. (*Id.* at ¶¶ 55-57.) Alleyne averred that the Appellants made the false statements in an effort to influence the findings of the accident investigation officer and the Medical Examiner's Office. (*Id.* at ¶¶ 52, 67.)

Alleyne alleged that Appellants repeated the false statements first made during the investigation to the District Attorney's Office in order to persuade the District Attorney's Office to file criminal charges. (*Id.* at ¶¶ 58, 67.) Alleyne alleged that Appellants provided a warped view of the evidence in order to manufacture probable cause, which they knew was lacking. (*Id.* at ¶¶ 67-70, 85.) Alleyne also alleged that Appellants instituted criminal proceedings against him due to Officer Brady's position as a Philadelphia Police Officer. (*Id.* at ¶ 66.)

On January 4, 2016, Appellants moved for summary judgment. (C.R. No. 27.) Appellants argued that they were entitled to summary judgment because Alleyne could not prove that Appellants initiated his criminal prosecution and probable cause existed to charge Alleyne with both offenses. Citing an unreported federal case, *Stango v. Rodden*, (E.D. Pa., No. Civ.A. 00-CV-5709, filed Aug. 21, 2001), Appellants first argued that as police officers, Appellants typically could not be liable for malicious prosecution because prosecutors, rather than police officers, initiate criminal prosecutions. Appellants argued that, as police officers, they could only be found liable if they knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion, and there was no evidence of either false information or such interference. Appellants further argued that Alleyne could not prove that Appellants lacked probable cause,

4

which is an element of both false arrest and malicious prosecution,[3] because the judge at the preliminary hearing in Alleyne's criminal trial ruled that probable cause existed.

In response to Appellants' motion for summary judgment, Alleyne first argued that Appellants could be liable in the instant case, despite being police officers, because they made knowing misstatements of fact during the investigation and deliberately lied to Assistant District Attorney Jennifer Selber (ADA Selber) about the evidence in an attempt to persuade her to file criminal charges. Citing *Cosmas v. Bloomingdales Brothers*, 660 A.2d 83 (Pa. Super. 1995), Alleyne also argued that the finding of probable cause at the preliminary hearing does not preclude a claim for malicious prosecution. Finally, Alleyne argued that the issue of probable cause should go to a jury because there were genuine issues of material fact as to whether Appellants initiated Alleyne's criminal prosecution without probable cause. (C.R. No. 28.)

On March 15, 2016, the trial court denied Appellants' motion for summary judgment (C.R. No. 31), and the suit proceeded to trial.

---

[3] The elements of false arrest/false imprisonment are: (1) the detention of another person (2) that is unlawful. "An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). The elements of malicious prosecution are: (1) institution of proceedings against the plaintiff without probable cause and with malice, and (2) the proceedings were terminated in favor of the plaintiff. *Turano v. Hunt*, 631 A.2d 822, 825 (Pa. Cmwlth. 1993), *appeal denied*, 647 A.2d 905 (Pa. 1994).

**B. Trial**

The trial court conducted a jury trial, beginning on April 11, 2016, and ending on April 20, 2016.[4] The parties presented to the jury the following evidence.

*1. Alleyne*

Alleyne testified that his conflict with Officer Brady began after Alleyne started dating one of his coworkers, Romara Glenn (Glenn), who was the mother of Officer Brady's children. (Reproduced Record (R.R.) at 382a.) Alleyne testified that Officer Brady demonstrated his frustration of Alleyne's relationship with Glenn through different forms of harassment, including smashing his windshield, breaking into his car, chasing after his car, and threatening Alleyne on several occasions, both in person and by phone. (R.R. at 382a-87a.) He testified that while he never observed Officer Brady with a gun, Glenn later informed him that Officer Brady was carrying a gun during some of the interactions with Alleyne. (R.R. at 394a-95a.) Alleyne testified that in each instance of harassment, he either attempted to flee or otherwise declined to engage with Officer Brady. (R.R. at 384a-87a.) Alleyne testified that, rather than engage with Officer Brady, he attempted to report the harassment. First, he informed the Philadelphia Police

---

[4] Prior to trial, the trial court ruled on three motions in limine from Alleyne. Alleyne's first motion in limine moved the trial court to permit him to introduce evidence and argue that the District Attorney's Office had absolute immunity from malicious prosecution. (C.R. No. 32.) The trial court granted Alleyne's first motion in limine and ordered that the trial court would instruct the jury that the District Attorney's office had immunity. (C.R. No. 38.) Alleyne's second motion in limine sought to preclude Appellants from introducing evidence or presenting argument that Alleyne was held for criminal charges following a preliminary hearing. (C.R. No. 33.) The trial court denied Alleyne's second motion in limine. (C.R. No. 40.) Alleyne's final motion in limine sought to preclude Appellants from presenting testimony of Assistant District Attorney Mark Levenberg, the prosecutor in Alleyne's criminal trial. (C.R. No. 34.) The trial court first denied Alleyne's third motion in limine, but later stayed the denial until further order by the trial court. (C.R. Nos. 37, 41.)

6

Department's 22nd District of the harassment and was given information about the Department's Internal Affairs Bureau (Internal Affairs), but he did not initially use that information because the harassment subsided for some time. (R.R. at 386a.) Alleyne testified that he later attempted to obtain a protection order from the Philadelphia Municipal Court, but after describing the situation, someone at the court "turned [him] away." (*Id.*) Finally, following an instance where Officer Brady threatened Alleyne at his mother's house, Alleyne elected to file a complaint with Internal Affairs. (R.R. at 387a.) Alleyne testified that he received a letter from Internal Affairs, requesting that he testify regarding his complaint against Officer Brady on July 23, 2012. (*Id.*)

Alleyne then testified about the collision on July 15, 2012, that gave rise to the criminal charges, as well as the aftermath. (R.R. at 388a-89a.) He testified that after the incident, which happened in a matter of seconds, he pulled his car over and dialed 911. (R.R. at 389a.) Alleyne testified that once the paramedics pronounced Officer Brady dead, Officer Nelson Ghee (Officer Ghee) placed him in handcuffs and brought him to the police station. (*Id.*) Alleyne recognized Officer Ghee because he was one of the Officers that responded to one of the instances of harassment by Officer Brady. (R.R. at 394a-95a.) Alleyne testified that he provided a sworn statement (Alleyne's Sworn Statement) to Detective Pirrone and Detective Greg Santamala (Detective Santamala), and he entered it into evidence during the civil trial. Alleyne's Sworn Statement recounted the collision as follows:

> I had just dropped off Romara, I call her Mara, off and I was waiting for her to go into the house and when I pulled off I was driving towards Meehan Ave[.] and I see Marc on the bike coming towards me. He is on Musgrave St[.] coming towards me, but he is before Meehan, on the other side. I was just pulling off so when I recognized that it was him I was like let me try to get [to] Meehan to make

7

my turn. I sped up to get to Meehan to beat him and make a left hand turn and as I was making the turn it seems that he was losing control of the bike and he was falling in front of my car. It seems like he either lost control and fell or he was trying to jump in front of the car. I am not certain. The bike went one way and he went the other way. My car struck him, the car rolled and then stopped. The neighbor in the corner house opened her door and said "You hit him" and that is when I got out of the car and dialed 911.

. . .

I didn't want any conflict with him. I have had prior contact with him. It's all on file and documented.

(R.R. at 812a-13a.) Alleyne informed the detectives that it was raining on the night of the collision, and that he first observed Officer Brady from approximately two blocks away, approximately 360 feet. (R.R. at 114a, 812a.) Alleyne's Sworn Statement also indicated that he informed Detective Pirrone and Detective Santamala of his past interactions with Officer Brady and that he had a pending Internal Affairs complaint against Officer Brady. (R.R. at 813a-15a.)

### 2. Officer Lackman

Alleyne called Officer Lackman, who the parties stipulated was an expert in accident reconstruction. (R.R. at 162a.) Officer Lackman testified that he conducted an accident investigation of the collision with Alleyne and Officer Brady. (R.R. at 168a.) He received the assignment from one of his supervisors, who informed him that an off-duty police officer had been hit by a car while riding a bicycle. (R.R. at 169a.) Officer Lackman testified that he arrived at the scene of the collision on July 16, 2012, at approximately 1:00 a.m. and conducted his investigation until approximately 6:00 a.m. (R.R. at 163a.) Officer Lackman testified that, prior to starting his investigation, officers at the scene informed him that the collision was the culmination of an ongoing dispute and that the assailant

8

may have "intentionally ran this guy down." (R.R. at 169a.) Officer Lackman testified that any information on the "bad blood" between Alleyne and Officer Brady was irrelevant to his investigation, which only concerned the physical evidence. (R.R. at 170a-71a.) Officer Lackman further testified, "a relationship, a back and forth, that has nothing to do with the science or mathematics of crash reconstruction." (R.R. at 172a.)

After he conducted his investigation, Officer Lackman drafted an accident investigation report (Officer Lackman's Accident Investigation Report), which Alleyne presented at trial. In his report, Officer Lackman determined that Alleyne was driving between 10 and 15 miles per hour, despite the posted speed limit being 25 miles per hour. (R.R. at 743a, 749a.) Based on the physical evidence, Officer Lackman determined that Alleyne's car and Officer Brady collided and Officer Brady fell to the ground in front of the car. (R.R. at 749a.) Alleyne's car then rolled over Officer Brady's body. (*Id.*) Regarding Alleyne's actions immediately before and after the collision, Officer Lackman found:

> [Alleyne] accelerated after the initial impact while steering left, then swerving back to the right. . . The acceleration was, more likely than not, a panic reaction from [Alleyne] after the impact occurred.
>
> . . .
>
> The evidence, specifically the tracking of [Alleyne's] tires in acceleration post-collision, does show the driver did steer left at or just prior to collision. Unfortunately, that avoidance maneuver was conducted too late, past the point if [sic] return, and the collision occurred.

(R.R. at 749a-50a.) Officer Lackman determined that Alleyne continued to drive for another 65 feet after the impact before stopping. (R.R. at 750a.) Officer Lackman's report concluded that both Alleyne and Officer Brady could have taken some action to avoid the collision: Alleyne could have either stopped his car or veered to the left

9

to avoid the impact, and Officer Brady could have steered his bicycle out of the trajectory of Alleyne's oncoming car. (*Id.*) Officer Lackman also concluded that Alleyne had a "greater responsibility" to avoid the collision, given that he was in a vehicle while Officer Brady was riding a bicycle. (*Id.*)

During his trial testimony, Officer Lackman acknowledged that the collision was a low-impact, low-speed collision, with minor damage to both Alleyne's car and Officer Brady's bicycle. (R.R. at 173a.) Officer Lackman testified that had Alleyne been driving faster, Officer Brady likely would have collided with the windshield of Alleyne's car, as opposed to having been run over by the car. (*Id.*) Officer Lackman also testified that one of the options in his report for Alleyne to prevent the collision, stopping his vehicle, would not be a reasonable option if Alleyne recognized Officer Brady and feared for his life. (R.R. at 171a.)

Officer Lackman testified that in the late morning to early afternoon on July 16, 2012, he was called down to the District Attorney's Office for a charging meeting—*i.e.*, to discuss a potential criminal case. (R.R. at 176a.) Officer Lackman testified that all the district attorneys from the Homicide Unit, including ADA Selber, John Doyle (ADA John Doyle), and Tim Lipscomb (ADA Tim Lipscomb), attended the charging meeting, as did Detective Pirrone and Detective Santamala. (*Id.*) Officer Lackman testified that, prior to him speaking about the case, he "wasn't listening to what [the others in the room] were saying. [He was] sitting there waiting to tell [his] part." (*Id.*) Officer Lackman testified that when it was his turn to contribute, he discussed the physical evidence with ADA Selber and showed her photos from the scene. (R.R. at 177a.)

### 3. *Halikman*

Alleyne called James Halikman (Halikman) as an expert in "field accident reconstruction and its protocols" to rebut the testimony of Officer Lackman. (R.R. at 84a.) Halikman testified that he conducted an accident reconstruction investigation by analyzing the crash report, reports by Officer Lackman and Detective Pirrone, photographs of the scene, Alleyne's car, and Officer Brady's bicycle, a nighttime video of Alleyne's driving path, observation of Officer Brady's bicycle, a study of the accident location, an interview with Alleyne, Alleyne's Sworn Statement, and a transcript of the preliminary hearing. (R.R. at 84a-85a, 108a.) Halikman testified that the history of the conflict between Alleyne and Officer Brady, and the specifics of each interaction, were all "piece[s] of the puzzle," which were essential to know in order to fully evaluate the case. (R.R. at 86a.) Halikman testified that Officer Brady was violating traffic regulations by riding his bicycle in the middle of the road instead of the right side of the road and by not having a headlight on his bicycle. (R.R. at 90a, 98a.) Halikman testified that despite Alleyne's Sworn Statement indicating otherwise, it was not possible that Alleyne observed Officer Brady from two blocks away. (R.R. at 99a-100a.) Halikman testified that Alleyne would only have been able to see 165-175 feet away, and his vision would have been further hindered given that it was raining and given that Officer Brady did not have a headlight on his bicycle. (R.R. at 99a-103a.) Halikman testified that Officer Brady would have noticed the headlights of Alleyne's oncoming car before Alleyne noticed Officer Brady's oncoming bicycle. (R.R. at 100a-01a.)

Halikman also prepared an accident reconstruction report, which Alleyne presented to the jury. (R.R. at 990a-1009a.) Halikman concluded that

11

Officer Brady was the cause of the accident, and Alleyne could not have avoided the collision. (R.R. at 84a, 997a.) Halikman explained that Alleyne was at a "point of no escape," meaning that there was nothing Alleyne could have done to avoid colliding with Officer Brady. (R.R. at 97a, 997a.) Halikman also concluded that Officer Brady took no evasive action, which indicated that he intentionally continued into the collision with Alleyne's car. (R.R. at 996a.) Halikman testified that Officer Brady was more culpable because he was riding his bike in the middle of the road as opposed to the right side of the road, as traffic regulations require, and because he continued towards Alleyne's car without making any evasive maneuvers. (R.R. at 105a.)

On cross-examination, Halikman testified that he conducted his investigation and prepared his report a year after the District Attorney's Office charged Alleyne with Involuntary Manslaughter and Homicide by Vehicle. (R.R. at 106a-107a.) Accordingly, Halikman acknowledged that his investigation and report had no bearing on the decision to prosecute Alleyne for those charges. (R.R. at 107a.) Halikman also acknowledged on cross-examination that the evidence Halikman reviewed did suggest that Alleyne sped up before the moment of impact. (*Id.*)

### 4. Garnett

Alleyne called John Garnett (Garnett), who was working as a forensic technician at the Philadelphia Medical Examiner's Office on July 16, 2012. Garnett testified that his role as a forensic technician entailed taking calls from the Police Department and writing down the information verbatim, then typing that information into a formal report. (R.R. at 209a.) Alleyne presented to the jury the report that Garnett prepared regarding the death of Officer Brady (Medical Examiner Summary

Report).  (*Id.*)  The Medical Examiner Summary Report provides much of the basis for Alleyne's allegation that Appellants made misrepresentations or false statements during the investigation.   The report indicates that Garnett first spoke with Detective Pirrone about Officer Brady's death at 1:00 a.m. the morning of the collision and received the following information:

> [Detective Pirrone] said that the decedent was hit by a car by someone that he knew.  Apparently, there had been an argument with this person in the past.  The person waited for him to get off work, and hit him with a car.

(R.R. at 805a.)  Garnett testified that he specifically remembered the conversation with Detective Pirrone because it left him with the impression that the driver was waiting to attack Officer Brady.  (R.R. at 210a.)

According to the Medical Examiner Summary Report, later, at 7:06 a.m., Garnett spoke with Officer Lackman, who told Garnett the following information:

> The decedent was hit by a car while he was riding his bicycle.  It was a low impact collision.  The bike was upright at the time of impact.  The decedent went to the ground on the bike and it was dragged for 91 feet.  The man driving the car intentionally hit the decedent.  The driver was the decedent's ex-girl's new boyfriend.  There was an extended domestic situation.  The decedent and other officers in the 14th District were on desk duty because of this situation.  The driver of the vehicle will be charged.

(R.R. at 805a-806a.)

The Medical Examiner Summary Report also reflects that, at 2:38 p.m., Detective Pitts relayed the following information to the Medical Examiner's Office:

> [The] only current statement is from the individual who struck the decedent.  There are inconsistencies with what [sic] the witness [(Alleyne)] said in comparison to the

13

crime scene findings, in particular, the point of contact and the length the decedent was dragged.

(R.R. at 806a.)[5]

The Medical Examiner Summary Report also evinces a second communication by Officer Lackman at 3:00 p.m.:

Driver in custody, charges under debate with [District Attorney's] office. Decedent has an extensive history of 3+ years of domestic issues with his ex-wife's boyfriend. The decedent and ex-wife's boyfriend have a verbal confrontation at 1800 on 7-15-12, at 2339 a 911 call for a bike accident occurs involving the decedent (riding a bike) and the ex-wife's boyfriend (driving a car). Evidence on scene supports the bike was hit by the car head-on. Car driver said he saw the decedent riding his bike in the street two blocks away and appeared the decedent was "playing chicken" with his car.

(Id.)[6]

Finally, the Medical Examiner Summary Report provides the following details regarding an incident prior to the collision, in which Officer Brady was shot:

He was shot previously about 2 years ago. He was treated at Einstein [Medical Center] and the shooting happened in the same area where he was hit by a car. He was shot by someone driving past in a car that is similar to the one that is supposed to have hit him, a White Accura [sic].

(R.R. at 807a.)

---

[5] Garnett testified that one of his former coworkers recorded the information from the 2:38 p.m. conversation with Detective Pitts and the 3:00 p.m. conversation with Officer Lackman. Garnett testified that his coworker would have recorded the information verbatim. (R.R. at 214a-16a.)

[6] The report incorrectly characterizes Glenn as Officer Brady's ex-wife. Glenn and Officer Brady were never married.

14

### 5. *Detective Pirrone*

Alleyne called Detective Pirrone, who testified about the investigation and the charging meeting on July 16, 2012. Regarding the investigation, Detective Pirrone testified that he first heard of the collision at 12:10 a.m. from a call from Officer Ghee, one of the officers to respond to the scene. (R.R. at 243a.) Detective Pirrone testified that Officer Ghee provided general information about the collision, including that Alleyne informed Officer Ghee that he had a personal conflict with Officer Brady. (*Id.*) Detective Pirrone testified that while he waited for Officer Ghee to bring Alleyne to the police station for questioning, Detective Pirrone began acquiring information about Alleyne and Officer Brady. (R.R. at 226a.) Detective Pirrone testified that he did, in fact, call Garnett at 1:00 a.m. and faxed additional documentation to the Medical Examiner's Office. (R.R. at 221a, 226a.) Detective Pirrone testified that once Alleyne arrived at the police station, he gave Alleyne his *Miranda* warnings[7] in an interrogation room, then he and Detective Santamala brought Alleyne to an "air conditioned comfortable" office to obtain Alleyne's Sworn Statement because he viewed Alleyne as a witness rather than a suspect. (R.R. at 228a, 239a.) He testified that he interviewed Alleyne for about an hour, after which he and Detective Santamala also took a statement from Glenn. (R.R. at 232a-33a.) Detective Pirrone testified that he did not review any police reports prior to interviewing Glenn. (R.R. at 232a.) Detective Pirrone testified that he knew to ask Glenn about prior complaints that she made against Officer Brady from another officer in his unit, rather than from having read any police reports. (R.R. at 233a.)

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Detective Pirrone testified that he arrived to the charging meeting late, and, when he arrived, Officer Lackman was discussing his findings with the various district attorneys. (R.R. at 223a-25a.) Detective Pirrone testified that he was merely at the charging meeting to deliver the case file and did not remain at the meeting for very long. (R.R. at 225a.) Detective Pirrone testified that his only contribution to the conversation was that he spoke to "possible inconsistencies" in Alleyne's Sworn Statement. (*Id.*)

Viewing the trial record in the light most favorable to Alleyne,[8] there were various points in which Alleyne's counsel undermined Detective Pirrone's testimony. Through conflicting evidence and Detective Pirrone's prior testimony in Alleyne's criminal trial and at a deposition, Alleyne's counsel introduced evidence to impeach Detective Pirrone on the following points: (1) whether he called Garnett; (2) whether he told Garnett that Alleyne was lying in wait to attack Officer Brady; (3) whether he told Officer Lackman that he suspected the collision was intentional; (4) whether he read the reports of the harassment allegations before interviewing Alleyne and Glenn; (5) whether he attended the charging meeting; (6) whether he falsely stated at the charging meeting that Alleyne and Officer Brady had an argument hours before the collision; and (7) whether he intentionally omitted information at the charging meeting about Internal Affairs investigations into Officer Brady.

### 6. Detective Pitts

Detective Pitts testified that he arrived at the scene of the collision at 1:40 a.m. (R.R. at 253a.) He learned general facts about the case from the officers

---

[8] Given that Alleyne won at the trial level, we must read the record in the light most favorable to him and grant him every favorable inference. *Shamnoski v. PG Energy, Div. of S. Union Co.*, 858 A.2d 589, 593 (Pa. 2004).

that were already at the scene, namely that the collision involved a vehicle and a bicycle and that the deceased was an off-duty police officer. (R.R. at 253a-54a.) Detective Pitts testified that he "knocked on the doors" of houses near the site of the collision but was unable to find any witnesses. (R.R. at 254a-55a.) Detective Pitts testified that he either arranged for Glenn to be brought to the police station, or he took her there himself. (R.R. at 255a.) He testified that after arriving at the police station, he received instructions to interview Alleyne's cousin, Robert Bailey (Bailey). (R.R. at 256a.) Detective Pitts testified that he took Bailey's statement at 5:45 a.m. (*Id.*) Alleyne presented Bailey's statement to the jury, which corroborated some of the incidents in which he alleged that Officer Brady harassed him. (R.R. at 841a-42a.)

Detective Pitts testified that he did not remember whether or not he spoke with the Medical Examiner's Office regarding Officer Brady. (R.R. at 260a.) He also testified that he did not state what the Medical Examiner's Summary Report quotes him as stating: "I didn't say what's in that paragraph." (R.R. at 260a-61a.) Detective Pitts also specifically denied stating, "[the] only current statement is from the individual who struck the decedent," and acknowledged that he had interviewed and obtained a statement from Bailey before the Medical Examiner's Summary Report indicated that he made that statement. (R.R. at 259a.)

### 7. *Lieutenant Riehl*

Lieutenant Riehl testified that he was the ranking supervisor of the Homicide Unit and that he acted as a liaison between the Police Department and the District Attorney's Office. (R.R. at 124a.) Regarding the investigation of Officer Brady's death, Lieutenant Riehl testified that on the morning of July 16, 2012, Detective Pirrone informed him that there had been a fatality involving an off-duty

17

police officer. (R.R. at 125a.) He testified that he sent three of his officers, including Detective Pitts, to the scene of the collision, but he did not go himself. (R.R. at 125a-26a.) Lieutenant Riehl testified that he never spoke with Officer Lackman about the investigation; instead, he communicated with one of the other officers that he sent to the scene, Sergeant Hayes. (R.R. at 125a.)

Lieutenant Riehl testified that generally, as his staff investigates cases, all documents obtained during the investigation are placed on a desk in a central location in the Homicide Unit's office. (R.R. at 124a.) These documents constitute the case file, which is available to every officer who works on that case. (R.R. at 124a-25a.) Lieutenant Riehl testified that on the morning of July 16, 2012, the Homicide Unit printed reports by Glenn and Alleyne regarding harassment by Officer Brady, as well as a report describing an instance where an unknown assailant shot Officer Brady and added them to Officer Brady's homicide case file. (R.R. at 129a-131a.) Lieutenant Riehl denied obtaining those documents himself: "I definitely didn't print it out, but somebody did." (R.R. at 129a.) Lieutenant Riehl testified that he spoke with Internal Affairs Captain Carol Adams (Captain Adams) about the matter and requested and received the Internal Affairs investigation file on Officer Brady. (R.R. at 135a-36a.) He testified that he began receiving the documents from Internal Affairs on the morning of July 16, 2012, and continued to receive documents in the following days. (R.R. at 134a-37a.)

Lieutenant Riehl testified that he had doubts about charging Alleyne. (R.R. at 137a-38a.) Specifically he was "skeptical" about the conclusions in Officer Lackman's Accident Investigation Report:

> To me, I want clear, concise facts on how you know that
> this person struck the bike and not the other way around.
> How do you know this person had to retreat when the other

18

person could have retreated just as easily? I didn't get any of that. All I got is that he swerved into the bike.

(R.R. at 138a.) Lieutenant Riehl testified that he and Detective Pirrone disagreed on whether the evidence warranted charges. (*Id.*) Lieutenant Riehl testified that Detective Pirrone believed that charges were warranted because there were no skid marks on the road and Alleyne did not use his brakes until long after the moment of impact collision. (R.R. at 138a-39a.) According to Lieutenant Riehl, Detective Pirrone reasoned that the history of harassment by Officer Brady towards Alleyne and Glenn suggested motive for Alleyne to run down Officer Brady. (R.R. at 138a.) Lieutenant Riehl testified that he told Detective Pirrone that he did not think highly of Officer Brady or "trust anything to do with Brady." (*Id.*) Lieutenant Riehl testified that, despite having doubts about charging Alleyne with a crime, he continued to detain Alleyne because otherwise he would have to explain why he released Alleyne without first consulting the District Attorney's Office. (R.R. at 141a.)

Lieutenant Riehl testified that he did not attend the charging meeting because he had another murder investigation to supervise. (R.R. at 162a.) Instead, he sent Detective Pirrone with the case file. (R.R. at 141a.) Lieutenant Riehl testified that his unit did not withhold any information from the District Attorney's Office. (R.R. at 160a.) He testified that for the entirety of his thirty-two-year career, the District Attorney's Office has always made the final decision of whether to charge someone with a crime. (*Id.*)

### 8. *ADA Selber*

Alleyne called ADA Selber to testify.[9]  ADA Selber testified that she was the Chief of the Homicide Unit at the District Attorney's Office.  (R.R. at 287a.) ADA Selber testified that, as Chief of Homicide, she decides whether or not to prosecute someone for homicide.  (R.R. at 288a.)  She testified that when the Police Department's Homicide Unit believes a case warrants prosecution, it contacts her to set up a meeting and present the evidence in the case.  (R.R. at 289a-90a.)  ADA Selber testified that approximately seven people attended the Alleyne charging meeting, including Detective Pirrone and Lieutenant Riehl, Assistant District Attorney John Doyle (ADA John Doyle), who specialized in vehicular homicide prosecutions, and possibly Officer Lackman and Detective Santamala.  (R.R. at 295a.)  ADA Selber testified that she decides whether to prosecute based on the evidence she is presented, not based on the opinions from the Police Department as to whether or not there is probable cause.  (*Id.*)  ADA Selber testified that, at the time of her decision to prosecute, she was generally aware that there had been "significant history" between Alleyne and Officer Brady prior to the collision.  (R.R. at 293a.)  ADA Selber testified that the two pieces of evidence that were presented to her that led her to prosecute Alleyne were (1) Officer Lackman's Accident Investigation Report and (2) Alleyne's Sworn Statement to Detective Pirrone and Detective Santamala.  (R.R. at 292a, 296a, 298a.)  ADA Selber testified, however, that she did not have any documentation or information from the Medical Examiner's Office, which is responsible for determining the cause of death.  (R.R. at 297a.)  ADA Selber testified that the cause of death in potential vehicular

---

[9] Before ADA Selber testified, the trial court instructed the jury that ADA Selber had immunity from lawsuits and could not be sued for her role in bringing charges against Alleyne.

homicide cases is always blunt-force trauma and, thus, the cause of death determination from the Medical Examiner's Office would not be relevant to her decision to charge Alleyne. (*Id.*)

### 9. ADA Levenberg

Assistant District Attorney Mark Levenberg (ADA Levenberg) testified that he represented the Commonwealth in Alleyne's criminal trial. ADA Levenberg testified that he did not attend the charging meeting; he was assigned Alleyne's prosecution afterwards. (R.R. at 324a.) He also testified that he did not remember having any conversations with Detective Pirrone about Alleyne's prosecution, but he knew that Detective Pirrone and Detective Santamala did not like Officer Brady and were not excited about charging Alleyne. (R.R. at 322a-23a.) ADA Levenberg testified that he never spoke with Lieutenant Riehl. (R.R. at 322a.) He testified that in preparation of Alleyne's prosecution, he spoke primarily with Officer Lackman. (R.R. at 323a.) ADA Levenberg acknowledged that Alleyne was never cited for a violation of a traffic law. (R.R. at 330a.)

### 10. Sergeant Yaletsko

Alleyne called Sergeant Andrew Yaletsko (Sergeant Yaletsko), who testified that he conducted an Internal Affairs investigation regarding allegations of stalking and harassment by Officer Brady against Alleyne and Glenn. (R.R. at 198a.) Sergeant Yaletsko testified that he spoke with several police officers who responded to calls involving Officer Brady. (R.R. at 199a.) He testified that those officers corroborated the allegations against Officer Brady. (R.R. at 199a-200a.) Sergeant Yaletsko testified that he believed there was sufficient evidence to charge Officer Brady with stalking and harassment. (R.R. at 201a.) Sergeant Yaletsko testified that

21

the matter never reached the Police Board of Inquiry due to Officer Brady's death. (R.R. at 202a.)

Sergeant Yaletsko testified that he called the Police Department's Homicide Unit on July 17, 2012, after seeing a segment of local news that described Officer Brady's death. (R.R. at 203a-04a.) He testified that he decided to call the Homicide Unit to discuss his investigation, reasoning that his investigation "may or may not be pertinent to Mr. Alleyne's defense when it came to the criminal trial." (R.R. at 203a.) Sergeant Yaletsko testified that he spoke with Lieutenant Riehl who responded by taking down his number and stating that he would have one of his officers call Sergeant Yaletsko. (*Id.*) Sergeant Yaletsko testified that no one from the Police Department's Homicide Unit or District Attorney's Office ever called him back to follow up on his initial call to the Homicide Unit. (R.R. at 203a-04a.)

*11. Remaining Witnesses*

Both Alleyne and Appellants called additional witnesses, though their testimony does not appear to bear on the issues in the instant appeal. Alleyne called Julia Alleyne, Alleyne's mother, and Glenn, who both testified regarding the conflict between Alleyne and Officer Brady. (R.R. at 273a-286a.) Alleyne also called two experts, Stephen Levinson, Ph.D., who spoke to Alleyne's economic loss, and Paul Amess, who spoke to damages from reputational harm. (R.R. at 340a-355a, 406a-416a.) Appellants called experts Adam Riefman and Gary Barach to refute Alleyne's damages experts. (R.R. at 417a-425a.)

*12. Motion for a Directed Verdict*

Before the trial court charged the jury, Appellants moved for a directed verdict. Appellants first argued for a directed verdict as to Detective Pitts, because his only involvement in the investigation was that he was present at the scene of the

22

collision. Appellants argued that the District Attorney's Office did not receive Garnett's report, which supposedly evinced false statements by Detective Pitts, until after charging Alleyne. The trial court determined that the involvement of Detective Pitts was for the jury to decide and denied the motion as to the claims against him. Appellants also argued that the trial testimony demonstrated that there was probable cause to charge Alleyne. They argued that ADA Selber based her decision to charge Alleyne on the accident investigation summary report and Alleyne's Sworn Statement. They also argued that ADA Selber knew of the alleged omissions from the police—namely, the Internal Affairs investigations. The trial court judge determined, however, that he would submit the issue of probable cause to the jury because, as he explained, "it is one of the elements of malicious prosecution." (R.R. at 431a.)

### 13. Jury Instructions

The trial court provided instructions to the jury regarding probable cause for malicious prosecution and false arrest. As detailed further below, the parties in the instant appeal dispute the propriety of the trial court's decision to have the jury determine the presence or absence of probable cause. The trial court gave the following jury instruction regarding probable cause and Alleyne's claim for malicious prosecution:

> If you find that the defendant or defendants initiated or continued a criminal proceeding against plaintiff Alleyne under any of the following circumstances, you may determine that he has established that the defendants or a defendant acted without probable cause.
>
> Number 1, defendant or defendants knew that the evidence failed to establish that the plaintiff acted recklessly or with gross negligence in operating his vehicle on the night of July 15, 2012.

23

Number 2, defendant or defendants withheld material facts at the charging meeting.

Number 3, defendant or defendants misrepresented facts or lied at the charging meeting.

Number 4, defendant or defendants failed to provide material facts to the Commonwealth that were obtained after the initiation of charges but during the pendency of the criminal case. So that would be between July of 2012 and June of 2014 when the case actually came to trial.

Number 5[, d]efendant or defendants withheld exculpatory information from the Commonwealth that they obtained after the charges were initiated but during the pendency of the trial.

(R.R. at 460a.)

Regarding Alleyne's claim for false arrest, the trial court gave the following instruction:

For your purposes, a false arrest is an arrest that is made without probable cause. Probable cause means that the person making the arrest believed at the time of the arrest, and a reasonable person under the same circumstances would also have believed that he had sufficient information of the facts and the law to reasonably believe that a crime had been committed and the person arrested was guilty of committing that crime. Probable cause for an arrest exists where the facts and circumstances within the knowledge of the person making the arrest at the time of the arrest and of which that person had reasonably trustworthy information were sufficient in themselves to lead a person of reasonable caution to believe that the person arrested had committed or was committing a crime.

(R.R. at 461a.)

### 14. *Jury Verdict*

On April 20, 2016, the jury returned a verdict favorable to Alleyne and awarded him damages in the amount of $1,030,250. (R.R. at 1583a-85a.) The jury found all three Appellants—Detective Pitts, Detective Pirrone, and Lieutenant

24

Riehl—liable for malicious prosecution. (R.R. at 1584a.) The jury determined that only Detective Pirrone and Lieutenant Riehl were liable for false arrest. (*Id.*)

## C. J.N.O.V.

After the jury returned a verdict for Alleyne, Appellants moved for judgment notwithstanding the verdict (J.N.O.V.). (C.R. No. 43.) Appellants advanced the following arguments: (1) probable cause existed to arrest and charge Alleyne; (2) there was no evidence presented at trial that the Police Department gave the District Attorney's Office false information; (3) information of the conflict between Alleyne and Officer Brady could reasonably be seen as providing motive and did not negate probable cause; (4) as officers, Appellants could not be held liable because there was no evidence presented at trial of willful misconduct, as required by the Tort Claims Act;[10] (5) there was no evidence presented at trial that the District Attorney's Office considered any false statements by Detective Pitts prior to filing charges against Alleyne; and (6) there was no evidence presented at trial that Appellants acted with malice. Appellants argued alternatively that they were entitled to a new trial because the trial court: (1) failed to instruct the jury on the Tort Claims Act; (2) provided an incomplete instruction regarding the evidentiary weight of the preliminary hearing; (3) provided an improper verdict form to the jury, resulting in an inconsistent verdict against Detective Pitts; and (4) improperly admitted hearsay evidence. Appellants also requested a remittitur, arguing that the Tort Claims Act required the trial court to cap Alleyne's damages.

The trial court denied Appellants' motion for J.N.O.V. (R.R. at 1586a-1612a.) Citing *Wainauskis v. Howard Johnson Company*, 488 A.2d 1117 (Pa. Super. 1985), the trial court concluded that, based on the evidence

---

[10] 42 Pa. C.S. §§ 8541-8564.

presented at trial, a reasonable jury could conclude that ADA Selber decided to charge Alleyne based on the false statements by Detective Pirrone and that Lieutenant Riehl was at the charging meeting but failed to correct Detective Pirrone's false statements. The trial court also determined that a reasonable jury could find that Detective Pitts provided false statements to Officer Lackman and the Medical Examiner's Office. The trial court also rejected Appellants' arguments for a new trial and for remittitur.

Appellants then filed the instant appeal.

## II. ISSUES

On appeal,[11] Appellants appear to argue both that probable cause should have been determined by the trial court judge, rather than by the jury, and that no reasonable jury could have found that Appellants lacked probable cause. Specifically, Appellants argue probable cause existed for Alleyne's arrest and prosecution based on the personal circumstances and history between Alleyne and Officer Brady and the fact that Alleyne admittedly recognized Officer Brady from over a block away but nonetheless accelerated instead of stopping his vehicle. Appellants argue in the alternative that, even if there was not probable cause to arrest and prosecute Alleyne, the trial court erred in entering judgment against Detective Pitts and Lieutenant Riehl, because Alleyne failed to show that those officers acted with malice or that their actions caused the arrest. Finally, also in the alternative,

---

[11] This Court's standard of review from a trial court's order denying a motion for J.N.O.V. is limited to determining whether the trial court abused its discretion or erred as a matter of law. *Hall v. Kiger*, 795 A.2d 497, 499 (Pa. Cmwlth.), *appeal denied*, 813 A.2d 846 (Pa. 2002). Additionally, we must view the record in the light most favorable to the verdict winner, giving him every reasonable inference. *Id.*

26

Appellants argue that the trial court erred in failing to enter judgment in their favor based on immunity, because Alleyne failed to prove an exception to immunity, such as willful misconduct.[12] With regard to this last issue, Appellants contend that, at a minimum, the trial court should have ordered a new trial as to immunity when the trial court declined to give a willful misconduct instruction.

## III. DISCUSSION

### A. Malicious Prosecution

The elements of malicious prosecution are: (1) the institution of proceedings against the plaintiff without probable cause and with malice, and (2) the termination of proceedings in favor of the plaintiff. *Turano*, 631 A.2d at 825. "Probable cause is a reasonable ground of suspicion supported by circumstances sufficient to warrant that an ordinary prudent person in the same situation could believe a party is guilty of the offense charged." *La Frankie v. Miklich*, 618 A.2d 1145, 1148 (Pa. Cmwlth. 1992) (en banc). Notably, a successful case for malicious criminal prosecution is both rare and arduous. "Malicious prosecution is an action which runs counter to obvious policies of the law in favor of encouraging

---

[12] Prior to jury instructions in Alleyne's civil trial, the parties also made arguments as to whether the jury should receive instructions on immunity. Specifically, Appellants argued that they were immune from suit under Section 8550 of the Tort Claims Act, 42 Pa. C.S. § 8550, titled "Willful misconduct," which provides:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is *judicially determined* that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

(Emphasis added.) The trial court determined that it would not charge the jury with a willful misconduct determination.

proceedings against those who are apparently guilty . . . It never has been regarded with any favor by the courts, and it is hedged with restrictions which make it very difficult to maintain." *Corrigan v. Cent. Tax Bureau of Pa., Inc.*, 828 A.2d 502, 506 (Pa. Cmwlth.) (internal quotations omitted), *appeal denied*, 839 A.2d 354 (Pa. 2003). "If this were not so, it would deter men from approaching the courts of justice for relief." *Id.*

Although the want of probable cause is a legal determination made by a court, as an element of malicious prosecution, the jury can have a role in the probable cause determination as well. This has led to somewhat confusing language in Pennsylvania case law. *Compare Turano*, 631 A.2d at 825 (stating, "it is beyond cavil that the question of want of probable cause for the criminal prosecution that gave rise to the civil action is a question not for the jury but exclusively for the court"), *with Wainauskis*, 488 A.2d at 1122 (stating, "where, as here, material facts are in controversy, the question is a mixed one [of law and fact] and it becomes the duty of the jury, under proper instructions from the court as to what will justify a criminal prosecution, to say whether the plaintiff in the civil action has shown want of probable cause upon the part of the defendant.") (internal citations omitted). The parties see a conflict in the rules surrounding probable cause determinations and, as a result, argue at length whether the jury or the trial court should have made the determination of want of probable cause.

While the parties' briefs suggest a conflict in the precedent, in reality these quoted cases are perfectly reconcilable. The Second Restatement of Torts provides a useful articulation of the interplay between judge and jury in a malicious prosecution case, one that we believe resolves this perceived conflict. Specifically, Section 673 provides, in relevant part:

28

### § 673 Function of Court and Jury

(1) In an action for malicious prosecution the court determines whether

(a) the proceedings of which the plaintiff complains were criminal in character;

(b) the proceedings were terminated in favor of the plaintiff;

(c) *the defendant had probable cause for initiating or continuing the proceedings*;

(d) the harm suffered by the plaintiff is a proper element for the jury to consider in assessing damages.

(2) In an action for malicious prosecution, subject to the control of the court, the jury determines

(a) *the circumstances* under which the proceedings were initiated in so far as this determination may be *necessary to enable the court to determine whether the defendant had probable cause* for initiating or continuing the proceedings;

(b) whether the defendant acted primarily for a purpose other than that of bringing an offender to justice;

(c) the circumstances under which the proceedings were terminated;

(d) the amount that the plaintiff is entitled to recover as damages;

(e) whether punitive damages are to be awarded, and if so, their amount.

Restatement (Second) of Torts § 673 (1977) (emphasis added). The Superior Court is correct in its explanation that "the presence or absence of probable cause is a question exclusively for the court where there are no *material* conflicts in the

testimony." *Wainauskis*, 488 A.2d at 1122 (emphasis added).[13]  Where there are material conflicts as to probable cause, the court can either (1) require the jury to find a special verdict upon which the court may determine the existence of probable cause; or (2) charge the jury under what combination of circumstances, which may be found under the evidence, the defendant did or did not have probable cause for initiating proceedings.  *De Salle v. Penn Cent. Transp. Co.*, 398 A.2d 680, 683 (Pa. Super. 1979); Restatement (Second) of Torts § 673, comment (e) (1977).[14]

---

[13] While we do look to Superior Court decisions for guidance, those decisions are not binding on this Court.  *Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 41 n.12 (Pa. Cmwlth. 2013).

[14] Comment (e) of Section 673 of the Second Restatement of Torts provides:

> In actions for malicious prosecution, . . . upon the issues of favorable termination and probable cause, the jury has only the function of finding the circumstances under which the defendant acted.  The court determines whether, under those circumstances, the termination was sufficiently favorable to the accused, and whether the defendant had or had not probable cause.  *If there is no conflict in the testimony as to what the circumstances were, the court has no need for a finding of the jury.  The jury is not called upon to act unless there is a conflict in the testimony that presents an issue of fact for its determination*.

> The respective functions of the court and jury in determining the issue of probable cause can be exercised by them in one of two ways.  The better but less usual method is to require the jury to find a special verdict setting forth the circumstances under which they find that the proceedings were initiated.  Upon these findings the court then determines whether the defendant had probable cause.  The usual method is for the court to charge the jury under what combination or combinations of circumstances, which may be found under the evidence, the defendant did or did not have probable cause for initiating the proceedings.

(Emphasis added.)

We are unable to locate an opinion of the Pennsylvania Supreme Court adopting Section 673, comment (e) of the Second Restatement of Torts.  Nevertheless, we believe Section 673, comment (e) of the Second Restatement accurately reflects the current law in Pennsylvania.  In *Miller v. Pennsylvania Railroad Company,* 89 A.2d 809 (Pa. 1952), the Supreme Court adopted Section 673, comment (d) of the First Restatement, which is identical to

30

Here, no "*material* conflicts in the testimony" relate to probable cause and, therefore, "the presence or absence of probable cause [was] a question exclusively for the court." *Wainauskis*, 488 A.2d at 1122 (emphasis added). At the charging meeting, ADA Selber had Alleyne's Sworn Statement—in which he described noticing Officer Brady and speeding up in Officer Brady's direction—and Officer Lackman's Accident Investigation Report, in which he opined that Alleyne was driving toward a bike rider but did not take any evasive maneuvers. (R.R. at 298a.) Alleyne's Sworn Statement also disclosed that Alleyne and Officer Brady had an ongoing conflict, and it provided examples of the various forms of harassment that Officer Brady exhibited toward Alleyne. "Probable cause is a reasonable ground of suspicion supported by circumstances sufficient to warrant that an ordinary prudent person in the same situation could believe that the party is guilty of the offense." *La Frankie*, 618 A.2d at 1148. Probable cause is not an actual state of guilt. *Id.* The history of confrontations between Officer Brady and Alleyne, Alleyne's Sworn Statement that he "sped up" towards Officer Brady, and evidence that Alleyne made no evasive maneuver, support a reasonable suspicion that Alleyne committed a crime.

Alleyne's arguments to the contrary are unpersuasive. Alleyne argues that the Police Department's Homicide Unit left out exculpatory information from the charging meeting, such as the various Internal Affairs investigations of Officer Brady for harassment. First, it is unclear why Alleyne thinks that a reasonable person would only find this information exculpatory. To the contrary, such

Section 673, comment (e) of the Second Restatement in all material respects. *See Miller*, 89 A.2d at 812. Moreover, the Supreme Court reaffirmed that the jury's only role in the probable cause determination of a malicious prosecution suit is to resolve material conflicts in evidence as they relate to probable cause. *See Hugee v. Pa. R. Co.*, 101 A.2d 740, 742 (Pa. 1954); *Byers v. Ward*, 84 A.2d 307, 310 (Pa. 1951).

information would make it seem more likely that Alleyne would have motive to harm Officer Brady, perhaps even warranting a decision to charge Alleyne with a more serious crime. Moreover, while the claim that Alleyne and Officer Brady were in an altercation hours before the collision was unsubstantiated, Alleyne himself stated that he received years of harassment from Officer Brady. While we acknowledge that there may have been misrepresentations and omissions by Detective Pirrone at the charging meeting, Alleyne has not provided any argument as to how an excision of misrepresentations or inclusion of additional evidence would vitiate the probable cause determination.

Our most analogous precedent in Pennsylvania case law appears to be *De Salle*, which entailed the prosecution of bacon theft. In *De Salle*, a railyard flagman and a train conductor boarded the caboose of a train positioned near a freight car loaded with bacon. When a container from the bacon-filled freight car went missing, railroad police entered the caboose and searched the personal belongings of both men. The railroad police eventually found 48 pounds of bacon hidden in a cupboard in the caboose. While both the flagman and the conductor denied any knowledge of either the existence of the bacon or how it appeared in the caboose, they also stated that no one had entered the caboose since they themselves boarded. Both men were criminally charged. Eventually, the conductor confessed that he placed the bacon on the caboose and that the flagman had no knowledge of the missing container of bacon. The flagman then sued the railroad company and railroad police for malicious prosecution and received a favorable jury verdict.

On appeal, the Superior Court in *De Salle* addressed the alleged lack of probable cause necessary to support the malicious prosecution verdict. The Superior Court determined that the trial court's decision to submit probable cause to the jury

"was error" because "[t]he discrepancies in the testimony were neither substantial, nor directly applicable to the issue of probable cause." *De Salle*, 398 A.2d at 683. Because the factual disputes were not material, the Superior Court explained, "the [trial] court itself should have determined the matter of probable cause." *Id.* The Superior Court in *De Salle* also determined that remand was not necessary on the issue of probable cause because it found that the company and railroad police had probable cause as a matter of law. The Superior Court reasoned that because "the bacon was found in the limited confines of a caboose over which [the flagman] and [the conductor] had exclusive control at the approximate time of the robbery," both the flagman and the conductor were likely suspects. *Id.* at 684.

Here, as in *De Salle*, any conflicts in the testimony are both insignificant and unrelated to the issue of probable cause. The testimonial discrepancy of who actually attended the charging meeting is negligible because what matters is not who was at the meeting, but what information ADA Selber received prior to her decision to charge Alleyne. Moreover, the lack of knowledge on her part of the full extent of the history between Officer Brady and Alleyne or of the Internal Affairs investigation does no more to undermine probable cause. As we explained above, if anything, the more ADA Selber knew of the conflict, the more likely she would have been to charge Alleyne. Because there is no dispute that ADA Selber was presented with Officer Lackman's Accident Investigation Report and Alleyne's Sworn Statement, regardless of who presented those to her, the trial court

33

judge should have made the determination that there was probable cause to charge Alleyne.[15]

## B. False Arrest

Under Pennsylvania law, false arrest is synonymous with false imprisonment. *Gagliardi v. Lynn*, 285 A.2d 109, 111 (Pa. 1971). The elements of false arrest/false imprisonment are: (1) the detention of another person (2) that is unlawful. "An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not." *Renk*, 641 A.2d at 293. Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *Cmwlth. v. Burno*, 154 A.3d 764, 781 (Pa. 2017).

---

[15] Finally, pertaining to the District Attorney's Office's decision to prosecute, Alleyne highlights the specific charges filed against him: Homicide by Vehicle and Involuntary Manslaughter. Alleyne avers that there could not have been probable cause to charge him with either crime because there was no indication that he was driving recklessly or with gross negligence, which is an element of both of those crimes. Alleyne also contends that there was no evidence that he violated any traffic law or regulation, which a prosecutor must demonstrate for Homicide by Vehicle. We find these arguments unpersuasive. First, the connection between the alleged misstatements and omissions and ADA Selber's ultimate decision is too attenuated to convince this Court that those misstatements and omissions impacted the specific crimes she elected to charge. As we explained, knowing more about the personal history between Alleyne and Officer Brady, which a reasonable person could view as motive, likely would have resulted in ADA Selber filing more serious charges. Second, like the ultimate decision to charge Alleyne, the District Attorney's Office's decision to move forward on a charge that included a violation of a traffic law was within the purview of the District Attorney's Office. Alleyne stated that he accelerated towards Officer Brady before striking him, and we cannot say ADA Selber was unreasonable to believe that Alleyne violated a traffic law by doing so. While it is unclear in the record before us what traffic law ADA Selber believed Alleyne had violated, she made the decision to proceed on that charge based on the evidence available to her from Lackman's Accident Investigation Report, not Alleyne's personal history. Third, the District Attorney's Office has prosecutorial discretion to bring multiple charges. Doing so does not evince malicious prosecution merely because there were improprieties during the investigation or conflicts in the evidence.

34

Here, the undisputed evidence supports the reasonable belief by the officer who initially detained Alleyne, Officer Ghee, that a crime had been committed. Officer Ghee was the first police officer to respond to Alleyne's 911 call. Readily apparent to Officer Ghee at the scene were the following facts: (1) Alleyne acknowledged that he struck the deceased with his vehicle while the deceased was riding his bicycle; (2) Alleyne acknowledged that he knew the deceased; (3) Alleyne acknowledged that he had a personal conflict with the deceased; and (4) the deceased, Officer Brady, died as a result of the collision. Upon these undisputed facts, we cannot say that Officer Ghee was unreasonable to believe a crime had been committed. The probable cause standard did not require Officer Ghee to resolve all yet-to-be-discovered discrepancies in the evidence or determine the sufficiency of the eventual accumulation of evidence to prove Alleyne's guilt beyond a reasonable doubt. The evidence that was immediately available on the scene provided Officer Ghee with a reasonable basis to suspect Alleyne committed a crime. Accordingly, we conclude that Alleyne's detention was based upon probable cause.[16]

## IV. CONCLUSION

Alleyne very effectively defended against the criminal charges he faced by highlighting serious holes and inconsistencies in the Police Department's investigation. While the improprieties by Appellants significantly hindered the criminal case against Alleyne, they did not rise to the level of preventing any reasonable person from believing Alleyne had committed a crime. As we noted in *Schell v. Guth*, 88 A.3d 1053 (Pa. Cmwlth. 2014), the law does not require that every

---

[16] Finally, because we reverse the trial court's order on the basis that ADA Selber had probable cause to charge and prosecute Alleyne, we need not address the remaining arguments presented by Appellants pertaining to immunity under the Tort Claims Act.

flawed investigation or failure to prove guilt beyond a reasonable doubt be vindicated by a subsequent lawsuit:

> We understand that [the plaintiff] believes that he was unjustly charged . . . He likely shares that feeling with many others ultimately acquitted of criminal charges in a court of law. His acquittal, however, does not necessarily mean that [the law enforcement defendants] should be held civilly liable for their roles in the criminal and internal administrative cases against [him].

*Schell*, 88 A.3d at 1070. Civil liability does not flow automatically from a weak criminal case. Here, there was sufficient undisputed evidence upon which Officer Ghee and ADA Selber could have reasonably believed that Alleyne committed a crime.

Accordingly, we reverse the trial court's order and remand the matter with instructions that the trial court enter judgment in favor of Appellants.

P. KEVIN BROBSON, Judge

36

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kareem Alleyne                 :

                                     :

            v.                    :    No. 1648 C.D. 2016

                                       :

Police Detective George Pirrone,   :
Police Detective James Pitts, and    :
Lieutenant Philip Riehl,            :

                  Appellants    :

## **O R D E R**

AND NOW, this 9th day of March, 2018, the order of the Court of Common Pleas of Philadelphia County (trial court), denying judgment notwithstanding the verdict, is REVERSED, and the matter is REMANDED to the trial court to enter judgment in favor of Appellants.

       Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge